Clifford E. VANTASSEL, Plaintiff,

v.

Marilyn S. BROOKS, Superintendent of the Department of Corrections of the Commonwealth of Pennsylvania, Sci–Cambridge Springs, in her individual capacity, et al., Defendants.

Civil Action No. 02–166 Erie.

United States District Court, W.D. Pennsylvania.

Feb. 1, 2005.

---

William T. Jorden, Esq., Jorden & White, Meadville, PA, for Plaintiff.

Thomas G. Eddy, Esq., Christian D. Bareford, Esq., Office of the Attorney General, Pittsburgh, PA, for Defendants.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff, Clifford E. VanTassel, a former employee of the State Correctional Institution at Cambridge Springs, Pennsylvania, brings this action under 42 U.S.C. § 1983 [1] against Marilyn S. Brooks, the former Superintendent of SCI–Cambridge Springs, and Jeffrey Beard, Secretary of the Department of Corrections alleging that his employment at the Institution was unlawfully terminated in violation of his First Amendment rights. VanTassel contends that he was discharged in retaliation for having criticized Brooks for making what VanTassel perceived as unauthorized and excessive expenditures of public funds on numerous improvements to her state-owned residence. Presently pending before this Court is a motion by the Defendants for summary judgment. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In resolving a motion for summary judgment, the Court must consider the evidence and draw all reason-

able inferences arising therefrom in the light most favorable to the nonmovant and determine whether the evidence, so construed, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where, as here, the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if admissible, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its burden, the nonmoving party must go beyond its pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. In applying this standard, we find that the following facts or factual inferences are supported by the record.

### II. BACKGROUND

During the time period relevant to this lawsuit, VanTassel was employed at SCI–Cambridge Springs as Facility Maintenance Manager 2. In this capacity, VanTassel had received favorable job performance ratings from Defendant Brooks's predecessor, Superintendent William Wolfe. (Pl.'s Ex. 1.) [2] He had no prior disciplinary record relative to his employ-

---

**1.** Section 1983 provides a cause of action for "any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002).

**2.** All citations to the record are from Plaintiff's and Defendants' exhibits as set forth,

respectively, in (a) Plaintiff's Appendix to Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment [Doc. No. 53] (hereinafter designated "Pl.'s Ex. ____") and (b) Defendants' Appendix to Motion for Summary Judgment [Doc. No. 49] (hereinafter designated "Def.s' App. at ____").

ment at SCI Cambridge Springs. (Pl.'s Ex. 18.)

Brooks was assigned to the Superintendent's position at SCI–Cambridge Springs in October of 2001. On October 11, 2001 VanTassel and Brooks toured the Superintendent's residence—which was owned by the Commonwealth—to discuss certain repairs and improvements. Despite the generally good condition of the house, Brooks ordered VanTassel to direct and perform extensive house renovations. (Pl.'s Ex. 3–5.) In total, Brooks directed expenditures exceeding $50,000 including monies spent on carpeting, cabinetry, dry-walling, wall-papering and painting, windows, tiling, electrical supplies, plumbing, new telephones, closet systems, and two air conditioners, among numerous other items. (Pl.'s Ex. 35.)

At the time of these expenditures, the Commonwealth had in place two policy provisions addressing monies spent on improvements to the Institution. DOC Policy 3.4.3 addressed, among other things, improvements made to Commonwealth-provided housing and stated, in relevant part:

1. Improvements, renovations, and/or repairs to Commonwealth residences costing more than $3,000.00 must be pre-approved by the respective Regional Deputy Secretary prior to the commencement of the work.

2. Improvements, renovations and/or repairs costing less than $3,000.00 may be made at the discretion of the Facility Manager.

(Pl.'s Ex. 51.) Policy 10.2.1 addressed procedures for "non-recurring maintenance projects," defined as "normal upkeep or restoration work done to keep a building, structure or nonstructural improvement in its present condition or state of usefulness, to prevent its deterioration, or to restore it to its previous condition." (Pl.'s Ex. 52.) Projects costing in excess of $10,000 re-

quired that the Facility Maintenance Manager submit a request for project approval on a "DC–178" form and obtain written approval from the DOC's Central Office. (Id.) For projects costing between $10,000 and $100,000, approval of the Regional Deputy Secretary was required as well. (Id.)

In addition, as of November 6, 2001, a freeze was placed on the purchase of all fixed assets and non-recurring maintenance projects due to the Commonwealth's budgetary problems. These restraints were communicated to all of the Commonwealth's Superintendents, including Brooks. (Pl.'s Ex. 2.)

At various times, Plaintiff communicated to Brooks his belief that the improvements to the Superintendent's residence required proper authorization and approval through the submission of DC–178 forms. (Pl.'s Ex. 6.) Notwithstanding these discussions, many of the expenditures directed by Brooks did not receive written approval from the DOC's Central Office. VanTassel believed that the renovations were not only excessive and unnecessary but also unauthorized, unbudgeted, and in violation of DOC policy. In December of 2001, he communicated as much to Ken Fowler, a DOC district maintenance manager who had traveled to Cambridge Springs to inspect the work being performed at the Superintendent's residence. Also present was Thomas Mook, a maintenance repairman employed at SCI–Cambridge Springs, who was assisting in the renovations. Mook later communicated the substance of VanTassel's complaints to Brooks.

VanTassel made numerous other complaints, both written and verbal, to various individuals concerning Brooks's expenditures on the renovations, which VanTassel viewed as a misappropriation of public funds. Beginning in October of 2001, he reported to Robert Calik, DOC Director of

Operations, his concerns that excessive amounts of funds were being spent on the renovations at Brooks's residence. (Pl.'s Ex. 13.) On February 22, 2002, VanTassel sent an e-mail to Calik indicating his concerns that the amounts spent on Brooks's residence were excessive and had not been properly authorized. (Pl.'s Ex. 14.) This e-mail was turned over to Deputy Secretary Love, who then contacted Brooks. Apparently, no further action was taken by Love or Central Office in response to Van-Tassel's complaints.

Upon learning of VanTassel's criticisms, Brooks undertook a campaign to achieve his termination. At some point prior to January 15, 2002, Brooks informed Security Captain Vicki Scott that she wanted VanTassel out of SCI–Cambridge Springs for questioning the propriety of her renovations and thereby undermining her authority at the Institution. On or around January 15, 2002, Brooks directed Captain Scott to obtain statements from employees at the Institution documenting attempts by VanTassel to undermine her authority. According to Scott, Brooks wanted statements about matters such as how VanTassel was directing his work force and what he was saying about expenditures at the Superintendent's residence. (Pl.'s Ex. 8.)[3]

On February 5, 2002, an e-mail addressed from Herbert Cioccio, Budget Analyst for SCI–Cambridge Springs, to Van-Tassel was circulated, evidencing the fact that VanTassel was continuing to report budget concerns over the residence project. (Pl.'s Ex. 8, 11.) The following day, Brooks called a meeting to announce that she was removing VanTassel from the residence project and placing Mook in charge of the renovations. During this meeting, while looking directly at VanTassel, Brooks stated that anyone interfering with the residence project would be terminated. (Pl.'s Ex. 4, 8, 12.) By this time, the conflict between Brooks and VanTassel was becoming common knowledge within the Institution and Brooks had created an atmosphere in which employees perceived that disloyalty to Brooks would not be tolerated. (Pl.'s Ex. 8.)

Shortly after VanTassel's removal from the Superintendent's residence project, an employee by the name of Jeanette Irwin reported witnessing an exchange between VanTassel and Sergeant Zuber in which VanTassel rubbed Zuber's coat sleeve. When Zuber inquired if there was something on her sleeve, VanTassel responded, "No, just the wrong color." (Ex. 8.) This comment was construed as implying that Brooks, an African–American female, favored and promoted fellow African–Americans over Caucasians.

Upon learning of this incident, Brooks proceeded to personally direct Captain Scott's investigation, instructing her to obtain statements about any comments made by VanTassel that could be perceived as

---

**3.** At oral argument, Defendants challenged the admissibility of Vicki Scott's sworn statement on the ground that it contains information beyond the scope of issues germane to this motion and that it is inadmissible to the extent it contains Scott's personal opinions about statements provided by third parties in the course of her investigation. Assuming *arguendo* that these objections are valid, a point which we need not presently decide, we nevertheless note that significant portions of Captain Scott's sworn statement—i.e., the portions on which we rely in resolving Defen-

dants' motion—are based on Scott's own personal observations and/or Brooks's own statements, which would be admissions by a party opponent admissible under Fed.R.Evid. 801(d)(2).

Defendants also object to Captain Scott's statement on the ground that she has admitted her own complicity in Brooks's alleged campaign of retaliation. However, that is a factor that affects the weight of Scott's testimony, not its admissibility. For present purposes, all questions of credibility must be resolved in Plaintiff's favor.

being racially derogatory or motivated. (Pl.'s Ex. 8.) In essence, the exercise became a fishing expedition for improprieties that could be used against VanTassel. (*Id.*) On various occasions, Thomas Mook and/or Heather Taylor (maintenance secretary) would inform Brooks of improprieties on the part of VanTassel, and Brooks would then direct Scott to investigate further. (*Id.*) In most instances, Scott was not able to verify what Mook and/or Taylor had reported to Brooks. This would cause Brooks to become agitated with Scott and Brooks would then send Scott back to the witness a second or third time, insisting that Scott bring back the statement that Brooks wanted. (*Id.*) Per Brooks's direction, Scott attempted to obtain the "most damning statements possible about Cliff VanTassel" in order to remain in Brooks's good favor. (*Id.*)

By and large, however, Scott could not produce what Brooks wanted. (Pl.'s Ex. 8.) Her investigation led her to conclude that it was Mook and Taylor alone who were reporting that VanTassel had made racially derogatory statements about Brooks and that those alleged improprieties generally were not corroborated by other employees within the Institution. (*Id.*) As one example, Mook accused VanTassel of stating in front of all the maintenance personnel that Mook "had his head up the Superintendent's dress." Scott interviewed the maintenance staff, all of whom denied that any such statement was made in their presence or that VanTassel had done anything to create a hostile work environment. (*Id.*)

Scott perceived that she was punished as a result of her failure to produce the kind of evidence that Brooks wanted. Her office was moved to a basement storage room which was hot, dirty, and windowless, and the remainder of her tenure at the Institution was made "very uncomfortable by Superintendent Brooks." (*Id.*)

Eventually, Scott retired from SCI–Cambridge Springs because of the "atmosphere of hostility" created by Brooks. (*Id.*)

On March 27, 2002, VanTassel was notified by Brooks in writing that he was being accused of inappropriate and unprofessional conduct in violation of certain provisions of the DOC's Code of Ethics. A Preliminary Disciplinary Conference was scheduled for April 3, 2002. Pursuant to DOC policy, Defendant Brooks participated in the Preliminary Disciplinary Conference, which culminated in Brooks's recommendation to DOC Chief Timothy Musser that VanTassel be terminated from his employment. Brooks's recommendation stated, in relevant part:

> It was established that Mr. VanTassel made inappropriate, offensive, and derogatory comments about the Superintendent of this facility. Specifically, this included racial comments as well as comments relative to his belief that the Superintendent was spending money inappropriately and without required approvals on the renovation of the state residence. It was also established that he made a comment to another staff member that she was the "wrong color" to be selected for a position for which she was applying, and that he made the comment to staff that the Superintendent got her promotion because of her race. He further stated that she would "jam herself up" hiring only black employees. He also made known his displeasure at the selection for the Corrections Food Service Manager position, stating that another employee should have gotten the job and that Brooks "did him wrong by bringing in a black man for the promotion."
>
> \* \* \* \* \* \*
>
> I recommend that Mr. VanTassel be terminated from his position as the Corrections Facility Maintenance Manager 2.

His actions have rendered him ineffective and unable to serve in his administrative position at this facility and have caused a division among members of the maintenance staff. Mr. Van Tassel's gross violations of the Department of Corrections Code of Ethics have created a hostile working environment. Due to his continued attempts to undermine, conspire, and discredit the administration of this institution and his refusal to accept responsibility for his actions, I have no trust in his overall character and ability to function as a leader, manager, or in any capacity as a professional Corrections employee.

\* \* \* \* \* \*

(Pl.'s Ex. 18.)

Defendant Brooks's recommendation was approved and, on April 12, 2002, Van-Tassel received formal notification of his termination. (Pl.'s Ex. 15.) Among the reasons cited by Brooks for his termination were the following:

The Pre–Disciplinary Committee found sufficient evidence regarding violation of the Code of Ethics, Section A, General Responsibility. Comments from staff members document that you made remarks including the following:

"I can't fucking believe all the money she's (Superintendent Brooks) spending in there (Superintendent's residence), and [William J.] Love [Deputy Secretary for Specialized Facilities & Programs] fucking approved it all." "Wait 'til Love sees the fucking bill I lay on him next week."

Staff statements support that you made remarks indicating that Superintendent Brooks is violating Department policy by spending money improperly on the state residence. Statements also established that you referred to Superintendent Brooks as a fat, black bitch and often refer to her as "BMB" or "Big Mama Brooks". A subordinate staff member provided a statement that you accused him of having his head up Superintendent Brooks' dress, and further stated that the comment was made in front all of [sic] the maintenance personnel. Staff statements document your remarks that Superintendent Brooks got her promotion because of her race, and that she was put here in a higher position, to be watched, and to make a mistake and be fired. Staff also indicated that you expressed your displeasure at the selection made for the Corrections Food Service Manager promotion, stating that another employee should have gotten the job and that Brooks did him wrong by bringing a "black" man in for the promotion.

Violation of Section A, Number 1, Discrimination was also substantiated. On February 7, 2002, you were in the Human Resource Office and spoke with an employee of the facility who was in the HR Office to inquire about a position she applied for as a Corrections Counselor. When you learned that she was applying for a different position, you rubbed the sleeve of the employee's coat. When she asked if she had something on her sleeve, you touched the top of her hand and stated, "No, just the wrong color[."] Two staff statements document this conversation. The clear implication was that the employee was the wrong race or color for the job. You made the statement to staff members that Superintendent Brooks got her promotion because of her race. You also told a staff member that the Superintendent was going to "jam herself up" hiring only black employees. Additional statements verify that you referred to the Superintendent as a "fat, black bitch[,"] and made the statement that "three counselors were interviewed and not hired because she (Brooks) would bring in a black[."] You admitted to

having received the Equal Employment Opportunity policy and the Code of Ethics, and clearly should have been aware of the institution's commitment to Equal Employment and non-discrimination.

You were found to be in violation of Section B, Number 10 [of the Ethics Code]. Written statements from several staff document inappropriate and derogatory comments that you made regarding Superintendent Brooks. These comments include those racial comments listed under the above charges, as well as comments relative to your belief that Superintendent Brooks was spending money inappropriately on the state residence, specifically that it was a misappropriation of state funds. Documentation substantiates the fact that you made a comment regarding money spent on the residence, in which you indicated that Superintendent Brooks and Tammy Turner (Business Manager) were finding a way to take money from the prison and put it in the state residence.

* * * * * *

Your actions have rendered you ineffective and unable to serve in your administrative position in this facility and have caused a division among members of the maintenance staff. Your actions were viewed as an attempt to conspire against, undermine, and discredit the administration of this institution. Discipline is not based solely on the multiple violations; any one of these violations is just cause for termination of employment.

(Pl.'s Ex. 15.)

A review by the Pennsylvania Auditor General's Office ultimately concluded that the remodeling of the residence involved approximately $53,000 worth of expenditures, $19,954 of which had not properly been approved. (Pl.'s Ex. 10.) In addition, it appears that Timothy Ringler, Chief of the Division of Fiscal Management for the Department of Corrections, performed an internal audit of the expenditures at the request of the Commonwealth Department of Professional Responsibility. As noted in the Department's report, Mr. Ringler concluded that many expenditures had been made without the prior written approval required under Policy 3.4.3. Mr. Ringler noted that "[i]f the repair costs were released to the public, the DOC would have a difficult time explaining the costs since the Commonwealth is running a deficit." (Pl.'s Ex. 35.) In particular, Mr. Ringler expressed concern about funds spent on the purchase of a $1,325.95 roll in tub, ten telephones for the residence, an order for a fold down table and laundry tub, cedar items and other items which Mr. Ringler considered excessive. (*Id.*)

Following his termination, VanTassel commenced this lawsuit, asserting the violation of his rights under federal and Pennsylvania law. Count 1 of VanTassel's amended complaint asserts a § 1983 claim against Brooks, in her individual capacity, for the alleged violation of his First Amendment rights, which he claims occurred when he was fired in retaliation for engaging in protected speech. Count 2 asserts a cause of action under § 1983 against Jeffrey A. Beard in his official capacity as Secretary of the Department of Corrections. Plaintiff's theory is that the DOC's official policies permitted Brooks to participate in the disciplinary proceedings despite a clear conflict of interest, thereby causing the alleged violation of his First Amendment rights. Count 3 of the amended complaint asserts claims against Brooks and Beard, both in their official capacities, under Pennsylvania's Whistleblower Law, 43 P.S. § 1421, *et al.*

Defendants have submitted a motion seeking summary judgment as to Counts 1

and 2 only. The issues have been briefed and argued and are ripe for disposition.

## III. DISCUSSION

1. *Plaintiff's § 1983 Claim Against Defendant Brooks (Count 1)*

The Supreme Court has recognized that public employees have a First Amendment interest in speaking freely on matters that are of public concern. *See City of San Diego, California v. Roe,* — U.S. —, 125 S.Ct. 521, 523, 160 L.Ed.2d 410 (2004); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Educ.,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). That is because "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers" and, therefore, if public employees could not freely speak to such matters, "the community would be deprived of informed opinions on important public issues." *City of San Diego,* — U.S. at —, 125 S.Ct. at 525 (citing *Pickering,* 391 U.S. at 572, 88 S.Ct. 1731). Thus, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* At the same time, however, a government employer has a legitimate interest in promoting efficiency, integrity, and discipline among its workforce and, to that end, it may impose certain restraints upon the speech of its employees. *City of San Diego, supra,* at 523; *Connick v. Myers,* 461 U.S. 138, 146, 150–51, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

██ To accommodate these competing concerns, courts apply a three-step test when confronted with a public employee's claim that he was retaliated against for engaging in protected activity. *See Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. First, the employee must establish the "protected" nature of his conduct by showing that the speech in question involves a matter of public concern and that the employee's interest in the speech outweighs the public employer's countervailing interest in providing efficient and effective services to the public. *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004) (citing *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996)); *Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir.2001). Second, the employee must demonstrate that the protected speech was a "substantial or motivating factor in the alleged retaliatory action." *Curinga,* 357 F.3d at 310 (citing *Baldassare,* 250 F.3d at 194–95; *Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997)). If the employee can meet his burden at steps 1 and 2, the employer can nonetheless avoid liability by showing "that it would have taken the adverse action even if the employee had not engaged in protected conduct." *Id.* (citing *Pro,* 81 F.3d at 1288). The inquiry at step 1 is a question of law, but the inquiries at steps 2 and 3 involve questions of fact. *Id.*

### A.

██ Defendants contend that Van-Tassel cannot meet his initial burden of showing that his criticism of Brooks was "protected speech," an assertion that requires us to first determine whether the speech in question involves a matter of public concern. *Curinga,* 357 F.3d at 310; *Baldassare,* 250 F.3d at 195. Speech is a matter of public concern "if it can 'be fairly considered as relating to any matter of political, social or other concern to the community.'" *Baldassare, supra,* at 195 (quoting *Green,* 105 F.3d at 885–86). In applying this criterion, we focus on the content, form, and context of the activity in question. *Id.*

We conclude that VanTassel's criticisms of Brooks—insofar as they related to her expenditures on the Superintendent's residence—involved a matter of public concern. VanTassel's complaints related to his belief that Brooks was spending excessive amounts of public funds on her residence at a time when the Commonwealth was in a state of financial crisis. Furthermore, VanTassel considered the expenditures a misappropriation of public funds in that they did not receive written authorization pursuant to Policy 10.2.1. Such allegations touch on matters of great importance to the public. *See Baldassare*, 250 F.3d at 195 ("[S]peech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breech of public trust on the part of government officials.' ") (quoting *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir.1993)); *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1271 (3d Cir.1994) ("[S]peech disclosing public officials' misfeasance is protected."); *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir.1989) ("[A]llegations of corrupt practices by government officials are of the utmost public concern."). Thus, the content of VanTassel's criticisms support a finding that the speech was protected.

Defendants argue that the Institution was in compliance with Policy 3.4.3, but we find this assertion to be irrelevant for summary judgment purposes. The record establishes that both the Auditor General's Office and Mr. Ringler found improprieties relative to Brooks's expenditures on the residence—improprieties of the very nature about which VanTassel had himself complained. The evidence suggests that, among other things, Brooks had ordered the main hallway and t.v. room painted three times because she did not care for the first two colors, had ordered a roll-in tub at a cost of $1,325.95, had purchased ten telephones for the residence, and had purchased numerous other items, including a fold-down table, laundry tub, and various cedar items which Mr. Ringler found to be excessive—particularly in light of the Commonwealth's budgetary problems. (Pl.'s Ex. 49.) Thus, the record supports a finding that VanTassel's criticisms were made in good faith and had colorable merit, irrespective of whether the Institution was technically in compliance with Policy 3.4.3, a point which need not be definitively addressed at present.

Defendants further argue that VanTassel's criticisms were of purely personal interest to him, as evidenced by the fact that they were made to fellow co-workers, not to Brooks herself or to other decision-makers who would have been in a position to act on his complaints. Our response is two-fold. First, the record supports an inference that VanTassel did communicate to Brooks his concern that her expenditures were not properly authorized. (*See* Def.'s App. at pp. 130–32.) In addition, VanTassel's communications to Ken Fowler and to Robert Calik, both verbally and in writing, belie the contention that VanTassel made no efforts to notify higher ranking DOC officials of the perceived misappropriations. Second, the fact that many of VanTassel's criticisms were in the nature of internal communications to fellow co-workers does not alone render his speech unprotected. "[T]he community's interest in the free exchange of information and ideas relating to matters of public concern ... is implicated in private exchanges between two individuals as well as in exchanges between an individual and members of the public." *Azzaro v. County of Allegheny*, 110 F.3d 968, 977–78 (3d Cir.1997). Our inquiry thus focuses on the *nature* of the information, not its audience. *Baldassare*, 250 F.3d at 197. "[I]f the content and circumstances of a [private] communication are such that the message conveyed would be relevant to the

process of self-governance if disseminated to the community, that communication is public concern speech, even though it occurred in a private context." *Azzaro, supra*, at 978.

Defendants also point out that VanTassel's e-mail to Robert Calik occurred in the context of an investigation concerning VanTassel's own alleged inappropriate and derogatory conduct. Furthermore, there is some evidence suggesting that Brooks and VanTassel had "bad blood" between them, even prior to her arrival at SCI Cambridge Springs, based on a former disciplinary incident which occurred while the two were employed together at a different state institution. Defendants suggest that this demonstrates that VanTassel had a purely private agenda in criticizing Brooks. However, even assuming that VanTassel had a personal interest in assigning blame to Brooks, this alone does not diminish the "public concern" character of his speech. *See, e.g., Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (despite assistant prosecutor's private motive "to gather ammunition" against her superiors in an effort to oppose a transfer, her circulation of inter-office questionnaire involved matter of public concern to the extent it addressed pressure to work in political campaigns); *Baldassare*, 250 F.3d at 197 (plaintiff's role in conducting internal investigation of alleged criminal wrongdoing by officials in county prosecutor's office was protected speech irrespective of plaintiff's personal motives). Based on the totality of the evidence, we remain satisfied that VanTassel's criticisms about Brooks's alleged excessive and/or unauthorized and/or unbudgeted expenditures of public funds concerned matters of considerable importance to the public.

 We next consider whether VanTassel's free speech interest in criticizing Brooks is outweighed by any injury his conduct could cause to the Common-

wealth's interest as a public employer. *Baldassare*, 250 F.3d at 197. For example, we consider whether VanTassel's speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of [his] duties or interferes with the regular operation of the enterprise." *Baldassare*, 250 F.3d at 198 (citing *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir.1989)). The relationship between the employer and employee within the "organizational hierarchy" is particularly germane in evaluating the significance of any disruption. *Id.* (citations omitted).

We note that VanTassel was a management level employee and, undoubtedly, his criticisms of Brooks severely undermined his professional relationship with her. Furthermore, the record suggests that VanTassel shared his criticisms with a number of fellow employees and, therefore, Brooks may well have believed that the criticisms were likely to cause disruption among Cambridge Spring personnel. However,

> [t]he First Amendment balancing test (of *Pickering* ) can hardly be *controlled* by a finding that disruption did (or could) occur. An employee who ... exposes ... corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes ... officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.... The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

*Baldassare,* 250 F.3d at 200 (quoting *O'Donnell,* 875 F.2d at 1062) (alterations and emphasis in the original).

Applying this standard, we conclude that the very strong public interest in uncovering perceived malfeasance on the part of public employees is not outweighed in this case by the Commonwealth's competing interest in avoiding the potential for disruption, loss of morale, or lack of discipline among its workforce. VanTassel has therefore established as a matter of law that his speech pertaining to the Superintendent's residence was protected speech.

### B.

 Alternatively, Defendants contend that they are entitled to summary judgment because "given the conclusions of an investigation into Plaintiff's misconduct and the findings of a pre-disciplinary conference, Plaintiff certainly would have been terminated anyway." (Def.'s Mem. in Supp. of Mot. for Summ. Judg. [Doc. No. 47] at p. 3.) However, whether or not an employer would have taken adverse action against an employee irrespective of the employee's protected speech is generally a question of fact for the jury. *See Curinga,* 357 F.3d at 310; *Baldassare,* 250 F.3d at 195. Here, there is a genuine dispute as to whether VanTassel's alleged misconduct and insubordination served as a pretext for his discharge. The sworn statement of Vicki Scott—when credited, as it must be for present purposes—establishes that Brooks was determined to achieve VanTassel's termination in retaliation for his criticisms about the residence project and that she engineered Scott's investigation so as to achieve that end, using his alleged racial and derogatory comments as an excuse. The evidence also allows the inference that, while Brooks was not the ultimate decision-maker, she played a major role in the decision-making process, not only by directing and manipulating Scott's investigation, but also

by expressing her complete lack of trust in VanTassel's character and leadership ability and by recommending to higher ranking DOC officials that his employment be terminated. In the analogous context of employment discrimination, a plaintiff can survive summary judgment by demonstrating that "those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 286 (3d Cir.2001) (Title VII case). *See also Roebuck v. Drexel University,* 852 F.2d 715, 727 (3d Cir.1988) ("[I]t is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision."). *Accord Griffin v. Washington Convention Ctr.,* 142 F.3d 1308, 1312 (D.C.Cir.1998) ("[E]vidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence."). Because there are genuine issues of material fact concerning whether VanTassel was discharged in retaliation for protected speech, Defendants' motion will be denied as to Count 1 of the Amended Complaint.

### 2. *Plaintiff's § 1983 Claim Against Defendant Beard (Count 2)*

Count 2 of the Amended Complaint asserts a § 1983 claim against Jeffrey Beard in his official capacity as Secretary of the Department of Corrections. Defendants move for summary judgment as to Count 2 on the ground that there is no evidence to show that Beard either participated in or had actual knowledge and acquiesced in the allegedly retaliatory conduct. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) (to be liable under § 1983, a defendant "must have personal involvement in the alleged wrongs," as liability "cannot be predicated solely on the opera-

tion of *respondeat superior*.") (citation omitted). We agree that the record is devoid of any such evidence.

■ Nevertheless, Vantassel has sued Beard under a theory that permits official-capacity suits against government policy-makers in cases where the subject policy was the "moving force" behind the violation of a plaintiff's federal rights. *See Monell v. New York City Dept. of Social Services* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (alleged policy of local department of social services and the board of education which required pregnant employees to take unpaid leaves of absence before those leaves are required for medical reasons involved official policy as the moving force of the alleged constitutional violation so that the bodies could be held liable under § 1983). VanTassel reasons that Beard should be liable because he was the policy-maker behind two DOC policies that allegedly enabled Brooks to accomplish her retaliation—the "Standardization of Pre–Disciplinary Conferences" procedural manual, § 12.2.2, and the "Human Resources and Labor Relations" procedural manual, § 4.1.1. Both policies, according to VanTassel, permitted Brooks to participate in the disciplinary proceedings despite her personal interest in the outcome. What then happened, according to VanTassel, is that Brooks ignored certain policy provisions and requirements that would have established an independent fact finding investigation. (*See* Pl.'s Br. at p. 6.) Brooks took over the investigation, decided to bring charges, appointed her employees and confidants to the panel, and determined to recommend that VanTassel be discharged. (*Id.*) VanTassel's theory is that Brooks would not have been able to retaliate against him for protected speech if the DOC would have had in place policies to ensure a fair and impartial fact finding investigation.

The problem with VanTassel's theory is that it does not establish that the challenged policies were the "moving force" behind the alleged violation of his First Amendment rights—which is the only violation alleged in this case. Instead, VanTassel essentially argues that, but for the challenged policies, Brooks would not have been in a position to accomplish his discharge. However, VanTassel's own allegations suggest that Brooks (or her underlings) disregarded certain policy requirements that would have ensured a fair fact-finding investigation. This theory is insufficient to establish that the policies themselves were the "moving force" behind the alleged First Amendment violation. *See Jones v. Wellham,* 104 F.3d 620, 627 (4th Cir.1997) (to establish municipal liability for a policy or custom, there must be an "affirmative link" between the policy and the violation and mere "but-for" causation will not suffice; the challenged policy decision must be one that made the ultimate violation "almost bound to happen, sooner or later', rather then merely 'likely to happen in the long run'") (citations omitted); *Harris v. City of Pagedale,* 821 F.2d 499, 507 (8th Cir. 1987) (Municipal liability under § 1983 cannot be premised on the mere fact that the unconstitutional act resulted from a municipal custom in a "but for" sense; it must be shown that the act was taken "pursuant to" the custom, i.e., that the municipal custom was "the moving force of the constitutional violation") (citation omitted); *Flatt v. City of Lancaster,* No. Civ.A.3:98–CV–2945–M, 2000 WL 1225787 at *2 (N.D.Tex.2000) ("The connection between the policy and the alleged constitutional deprivation must be greater than 'but-for' causation; indeed, the municipal policy must be 'affirmatively linked to the constitutional violation and be the moving force behind it.'"), *aff'd,* 273 F.3d 392, 273 F.3d 392 (5th Cir.2001) (TABLE, NO. 00–

11083). Accordingly, summary judgment will granted as to Count 2.

### 3. Qualified Immunity

 Defendants alternatively argue that they are entitled to summary judgment under the doctrine of qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that governmental officials performing discretionary functions are entitled to qualified immunity from liability arising out of conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known). We find the doctrine to be unavailing for Defendant Brooks.

 Defendants correctly note that the qualified immunity analysis turns on the "objective reasonableness" of the Defendant's action "assessed in light of legal rules that were clearly established at the time action was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The contours of the right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. 3034. On the other hand, there need not be legal precedent that involves the precise factual situation at hand. *See Larsen v. Senate of Commonwealth of Pennsylvania,* 154 F.3d 82, 87 (3d Cir.1998) (For reasonable officials to be on notice that their conduct would be unlawful, there need not be "a previous precedent directly on point"... "there need only be some[,] but not precise[,] factual correspondence between relevant precedents and the conduct at issue.") (citations omitted).

At the time that Brooks commenced her alleged retaliation against VanTassel, it was well established that First Amendment protection extended to speech involving the types of criticism being lodged by VanTassel relative to the expenditures on the Superintendent's residence. *See, e.g., Baldassare v. State of New Jersey,* 250 F.3d at 195 ("[S]peech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breech of public trust on the part of government officials.' ") (quoting *Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993)); *Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1271 (3d Cir.1994) ("[S]peech disclosing public officials' misfeasance is protected."); *O'Donnell v. Yanchulis,* 875 F.2d 1059, 1061 (3d Cir.1989) ("[A]llegations of corrupt practices by government officials are of the utmost public concern.").

It was equally well established that the First Amendment prohibited governmental agencies and officials from taking retaliatory action in response to an employee's expression of protected speech. *See, Baldassare, supra,* at 194 ("A public employee has a constitutional right to speak on matters of public concern without fear of retaliation. .... Public employers cannot silence their employees simply because they disapprove of the content of their speech.") (citations omitted); *Watters v. City of Philadelphia,* 55 F.3d 886 (3d Cir.1995) (police department could not dismiss employee for criticizing departmental program in newspaper); *Feldman v. Philadelphia Housing Authority,* 43 F.3d 823 (3d Cir.1994) (housing authority could not dismiss public auditor for report detailing wrongdoing by housing authority officials); *Holder v. City of Allentown,* 987 F.2d 188 (3d Cir.1993) (city could not terminate city employee for criticizing public employment residency requirement in local press); *O'Donnell v. Yanchulis,* 875 F.2d 1059 (3d Cir.1989) (township could not dismiss police chief for protected speech); *Czurlanis v. Albanese,* 721 F.2d 98 (3d Cir.1983) (county unlawfully discharged county mechanic for criticizing his department). Indeed, in *Bennis v. Gable,* 823 F.2d 723 (3d

Cir.1987), the Third Circuit, rejecting a qualified immunity defense in the context of a political patronage context, stated that "as of 1982 the law was 'clearly established' that a public employee could not be demoted in retaliation for exercising his rights under the first amendment." *Id.* at 733.

Because we find Plaintiff's claims against Defendant Beard insufficient as a matter of law, we need not address his argument on qualified immunity. In any event, however, this type of defense is not available in an official-capacity suit. *See Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

## IV. CONCLUSION

Based upon the foregoing reasons, the Defendants' motion for summary judgment will be granted as to Count 2 of Plaintiff's Amended Complaint and denied as to Count 1. An appropriate order follows.

## *ORDER*

AND NOW, this day of January, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Defendants' Motion [Doc. No. 46] for Summary Judgment is GRANTED in part and DENIED in part as follows:

1. Said motion is GRANTED as to Count 2 of the Amended Complaint, and

2. Said motion is DENIED as to Count 1 of the Amended Complaint.

JUDGMENT is HEREBY ENTERED in favor of Defendant Jeffrey A. Beard and against Clifford E. VanTassel as to Count 2 of the Amended Complaint.