

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2004

# Curinga v. Clairton

Precedential or Non-Precedential: Precedential

Docket No. 03-1278

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Curinga v. Clairton" (2004). *2004 Decisions.* Paper 966.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/966

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1278

DOMENIC J. CURINGA,
                    Appellant

v.

CITY OF CLAIRTON;
GEORGE ADAMSON, City Council
Member, in his individual capacity;
THOMAS MEADE, City Council
Member, in his individual capacity;
DOMENIC VIRGONA,City Council
Member, in his individual capacity

On Appeal from the
United States District Court for the
Western District of Pennsylvania
D.C. Civil Action No. 00-cv-00907
(Honorable Robert J. Cindrich)

Argued July 31, 2003

Before: SCIRICA, *Chief Judge*,
RENDELL and AMBRO, *Circuit Judges*

(Filed February 4, 2004)

SAMUEL J. CORDES, ESQUIRE
(ARGUED)
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, Pennsylvania 15222
        Attorney for Appellant

RONALD D. BARBER, ESQUIRE
(ARGUED)
Strassburger, McKenna, Gutnick &
Potter
322 Boulevard of the Allies, Suite 700
Pittsburgh, Pennsylvania 15222
        Attorney for Appellees

OPINION OF THE COURT

SCIRICA, *Chief Judge*.

At issue is whether a city council lawfully dismissed its principal policymaking employee who campaigned against winning councilmanic candidates in a primary election. The City of Clairton fired its municipal manager, Dominic Curinga, after he campaigned against an incumbent city council member who won re-election and against another successful councilmanic candidate. Curinga asserts the city council's decision to terminate him violated his First Amendment right to speak freely on a matter of public concern. Summary judgment was granted for defendants. We will affirm.[1]

_____

[1]We exercise appellate review over the entry of summary judgment under 28 U.S.C. § 1291. Our standard of review is plenary. *Morton Int'l, Inc. v. A.E. Staley*

## I.

In August 1997, Dominic Curinga was appointed municipal manager of the City of Clairton, Pennsylvania. Prior to this appointment, Curinga had served two terms on the Clairton City Council and one term as its mayor. The city council, which included Mayor Dominic Serapiglia and four council members, voted 4-1 in favor of Curinga's appointment as municipal manager. Curinga and all council members were members of the Democratic Party.

Curinga was responsible to the city council "for the administration of all municipal affairs placed in the Manager's charge." Curinga described his position as "run[ning] the day-to-day business operations of the city." In this capacity, he oversaw all city departments and supervised and managed all city employees, including the finance director, public safety director, public works director, fire chief and police chief. Curinga also implemented city council decisions in various departments within the municipality. He had the power to appoint, suspend, or remove all municipal employees and administrative unit heads with the advice and consent of the council. Curinga received a salary of $39,000 per

*Mfg. Co.,* 343 F.3d 669, 679 (3d Cir. 2003). A motion for summary judgment is properly granted when the record reveals no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* at 680.

year. His employment contract allowed at-will termination.

In 1999, while employed as municipal manager, Curinga ran for the position of District Justice as an "Action Team" Democrat. The "Action Team" ticket ran against the "regular" Democratic Party's ticket in the primary election. The "regular" party's endorsed ticket included City Councilman incumbent George Adamson and candidate Dominic Virgona, who was challenging incumbent City Councilwoman and "Action Team" Democrat Ruth Pastore.

In his deposition, Curinga admitted speaking out during the primary election campaign in favor of Pastore and against Adamson and Virgona. At one point in the primary campaign, all Democratic candidates were present at a roundtable question and answer session of a "Meet the Candidates" forum sponsored by the First AME Church of Clairton. During the session, a member of the audience questioned Curinga about alleged racial discrimination at the Sons of Columbus, an Italian ethnic heritage organization to which Curinga and other candidates belonged. The audience member asked, "How could you say you are going to be a fair magistrate when you're a member of an organization, a club, that does not allow blacks admittance[?]" Curinga was upset that two other club members present at the forum, Virgona and Curinga's opponent for District Justice, Armand Martin, failed to come to the club's defense.

The incident prompted Curinga to

write "An Open Letter to the Membership of the Sons of Columbus, Clairton:"

This forum was attended by a majority of African-American citizens. During the question period of the forum, the audience began to question President Curinga as to why African-American people are not permitted to join the Sons of Columbus. You, the members of the Sons of Columbus should know that Domenic Virgona and Armand Martin both stood back and were ashamed to admit that they are members of our organization. Why did they just step back? Why didn't they help to explain that our organization is an ethnic society, promoting our Italian heritage? Instead, these two members were aligned with the people sponsoring the forum, in an attempt to present a negative impression on [sic] the African-American people in attendance about our organization and our heritage.

An appeal is made to all members of the Sons of Columbus in Clairton, to **NOT** remember these two members on Election Day. The same way that they did not remember they were members of our organization at the forum.

It is up to you, the membership, to vote and support people that our [sic] proud of their Italian heritage and of their association with our organization. E l e c t : D o m e n i c J. Curinga—District Justice; Ruth Pastore—Council; . . . .

(emphasis in original). The letter was signed by "The 'Action Team' Democrats." Curinga admits he wrote the letter.

Following the letter's distribution to the membership, the Sons of Columbus expelled Virgona from the club. Virgona later stated that this letter and the resulting expulsion damaged his relationship with Curinga: "I was highly upset [about the letter] . . . [because Curinga] was attacking me and I wasn't running against him. But he had a purpose for attacking me that if Ruth Pastore won, he was sure that his job still existed." Virgona also explained, "[t]his letter did it all. And then after that, I mean we were having arguments all through, at every meeting of the Sons of Columbus."

During his campaign for District Justice, Curinga took off eleven weeks from work with pay, claiming he deserved "comp time" because of his prior attendance at evening and weekend city meetings. The city council never approved this use of "comp time."

On May 18, 1999, Curinga lost to Martin in the District Justice primary election. Adamson was re-elected and Pastore lost her seat on the city council to Virgona. Thus the "regular" Democratic Party candidates prevailed over the "Action Team" Democrats and the balance of power in the city council shifted to the

"regular" Democratic Party representatives.

In the summer of 1999, Curinga and two other defeated candidates filed an election challenge in the Court of Common Pleas of Allegheny County. The court dismissed the lawsuit, noting it was "grossly insufficient procedurally and substantively." *Pastore et al. v. Virgona et al.,* GD 99-8592 (C.P. Allegheny Cty., July 22, 1999). The Pennsylvania Commonwealth Court dismissed a subsequent appeal because petitioners failed to provide notice to defendants. *Pastore et al. v. Virgona et al.,* 741 A.2d 256 (Pa. Commw. Ct., Oct. 21, 1999).

On January 3, 2000, the new city council met and terminated the employment contracts of the municipal manager and municipal solicitor. Council members Adamson, Thomas Meade, and Virgona voted in favor of Curinga's termination, while Mayor Serapiglia and Councilman Terry Lee Julian voted against.

According to council minutes, the newly appointed municipal solicitor stated that the city council fired Curinga because he violated the Home Rule Charter by campaigning on city time and using taxpayer money to fund his campaign. Reasons for Curinga's termination cited in the council members' depositions included campaigning on city time; excessive absences during the campaign; the lawsuit alleging election fraud; a conviction for driving under the influence of alcohol; the Sons of Columbus letter; and interpersonal problems. Taking the facts in the light most favorable to Curinga, we assume he was fired because of his political speech, including the Sons of Columbus letter.

Curinga brought suit under U.S. Const. amend. I and 42 U.S.C. § 1983 against the City of Clairton and the three council members who voted for his termination, claiming the Clairton City Council had retaliated against him for exercising his right to free speech in writing the Sons of Columbus letter and for filing the election fraud lawsuit. In a Report and Recommendation, the Magistrate Judge recommended summary judgment for all defendants. The District Court adopted the Report and Recommendation. Curinga timely appealed.

## II.

### A.

This matter falls at the intersection of two separate First Amendment doctrines: freedom of speech and freedom of association. Both are implicated when a high-level government employee speaks out against his public employer during an election campaign. *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir. 1993). The First Amendment protects an employee who speaks out on a matter of public concern, so long as the employee's interests outweigh the government's interest in efficient operations. At the same time, public officials may be able to terminate a policymaking employee on the basis of political affiliation and conduct, regardless of freedom of association rights. While

this case implicates both doctrines, the result here is the same, because the public employer's interest is especially strong.

Although there has been little disparity in application and outcome, the various courts of appeals have divided over whether to employ an analysis based on freedom of speech or on freedom of association. In cases such as these, under both doctrines, the outcome is likely to be the same. Nevertheless, we believe that in most cases, where a confidential or policy making employee engages in speech or conduct against his public employer, the better analytical approach is found under the freedom of speech doctrine.

**B.**

Public employees have a First Amendment right to speak freely on matters of public concern. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Pickering v. Board of Educ.*, 391 U.S. 563, 571-72 (1968), (teacher's speech against school board is protected as a matter of public concern); *Watters v. City of Philadelphia,* 55 F.3d 886, 891 (3d Cir. 1995) ("judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech."). But there is protection only for speech in matters of public concern, *Connick v. Myers*, 461 U.S. 138, 146 (1983), and that which is not likely to disrupt the efficient operation of the workplace. *Pickering*, 391 U.S. at 568.

At the same time, the government has an interest in regulating the speech of its employees to promote "efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service." *Connick,* 461 U.S. at 150-51.[2] These interests must be balanced against the employee's interest in addressing matters of public concern and enabling the electorate to make informed decisions. 391 U.S. at 572.

The *Pickering* balancing test considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the

---

[2]Justice Powell elaborated:

To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Arnett v. Kennedy,* 416 U.S. 134, 168 (1974) (Powell, J., concurring in part).

regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The test also takes into account the extent of authority entailed in the employee's position. *Id.* at 390.

In a public employee's retaliation claim for engaging in protected activity, there are three factors to consider. First, the employee must demonstrate that the speech involves a matter of public concern and the employee's interest in the speech outweighs the government employer's countervailing interest in providing efficient and effective services to the public. *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir. 1996). Next, the speech must have been a substantial or motivating factor in the alleged retaliatory action. *Baldassare v. New Jersey*, 250 F.3d 188, 194-95 (3d Cir. 2001); *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997). Finally, the employer can show that it would have taken the adverse action even if the employee had not engaged in protected conduct. *Pro,* 81 F.3d at 1288. The second and third factors are questions of fact, while the first factor is a question of law. *Id.*

More than twenty five years ago, the Supreme Court set forth a separate analysis for politically motivated discharges of public employees. In *Elrod v. Burns,* 427 U.S. 347 (1976), the Court restricted the dismissal of public employees for partisan reasons to protect the employees' freedom of political belief and association. 427 U.S. at 357-58 (Brennan, J., plurality opinion). The Court also restricted the use of patronage to insure the efficiency of the public workplace, stating that "mere political association is an inadequate basis for imputing disposition to ill-willed conduct." *Id.* at 364-65.

At the same time, the Court in *Elrod* allowed dismissals based on political affiliation for "policymaking" positions. Policymaking employees with different political affiliations or orientations could thwart the will of the electorate and block the implementation of new policies. *Id.* at 367. Those who were not "policymakers" were "not in a position to thwart the goals of the in-party" and were protected. *Id*. The Court refined the policymaker exception four years later in *Branti v. Finkel*, 445 U.S. 507 (1980), holding "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518.

This court has considered factors that might lead to an *Elrod* exception. The determining test in *Ness v. Marshall* was whether a difference in party affiliation was "highly likely to cause an official to be ineffective in carrying out" his duties. 660 F.2d 517, 521 (3d Cir. 1981). In *Brown v. Trench,* we held a key factor was whether the employee has "meaningful input into decisionmaking concerning the nature and scope of a major township program." 787 F.2d 167, 168 (3d Cir.

1986).[3] *See also Zold v. Township of Mantua,* 935 F.2d 633 (3d Cir. 1991) (applying the *Branti* test to determine whether party affiliation is an appropriate requirement for the effective performance of the duties of the public office).

*Elrod* has been traditionally applied to terminations based on an employee's different political affiliation. Members of the same party are presumed to share common interests and goals, and patronage appointments usually come from the same party as the elected official. *Hall v. Ford,* 856 F.2d 255, 263 (D.C. Cir. 1988). But identical party affiliation does not necessarily ensure the subordinate's loyal adherence to the superior's policies. Primary election fights can be famously brutal, sometimes more so than contests in the general election, and animosity between candidates is likely to result. *See Robertson v. Fiore,* 62 F.3d 596, 600 (3d Cir. 1995); *Wilbur*, 3 F.3d at 219. Recognizing this, other courts of appeals have broadened the definition of "political affiliation" to include commonality of political purpose, partisan activity, and political support. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 208 (2d Cir.

1995); *Williams v. City of River Rouge,* 909 F.2d 151, 153 n.4 (6th Cir. 1990). These courts have upheld terminations under *Elrod-Branti* of policymaking employees who openly supported campaigns against their current or subsequently elected employer. *Kaluczky,* 57 F.3d at 204-05; *Williams,* 909 F.2d at 153-54.

So the Supreme Court has apparently crafted two methods of analyzing First Amendment claims depending on the constitutional rights implicated – the right of free speech (addressed by the *Pickering* balancing test) and the right of political affiliation (addressed by *Elrod/Branti*). But, as noted, *Pickering* and *Elrod* may easily overlap in situations involving campaign speech against one's public employer.

### C.

The Supreme Court has not yet directly confronted a situation where a policymaker is terminated both for political affiliation and speech. The District Court here applied the *Pickering* balancing test to the Sons of Columbus letter and the election fraud lawsuit, citing *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 718-20 (1996).[4]

---

[3]*Brown* listed specific factors in this determination, including "whether the employee participates in . . . discussions or other meetings, whether the employee prepares budgets or has authority to hire or fire employees, the salary of the employee, and the employee's power to control others and to speak in the name of policymakers." 787 F.2d at 169.

---

[4]The Court in *O'Hare* stated:

Our cases call for a different, though related, inquiry where a government employer takes adverse action on account of an employee or service provider's right of free speech. There, we

apply the balancing test from *Pickering* . . . *Elrod* and *Branti* involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government. It is true, on the other hand, as we stated at the outset of our opinion, *supra,* at 714, that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement. In those cases, the balancing *Pickering* mandates will be inevitable. This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it

But the plaintiff in *O'Hare* was not a policymaking or confidential employee. *See Rose v. Stephens,* 291 F.3d 917, 921 (6th Cir. 2002). Nonetheless, *O'Hare* implied that *Pickering* balancing should be used when termination is motivated by both a public employee's speech and political affiliation:

> A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement. In those cases, the balancing *Pickering* mandates will be inevitable.

518 U.S. 712, 719-20 (1996). Not only the balancing, but the outcome as well, may be inevitable because the public employer's interest may weigh so heavily that no other outcome is possible.[5] The speech may

---

> requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services.

*Id.* at 719-20 (citation omitted).

[5]For this reason, the Court of Appeals for the Sixth Circuit recently held that "where a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views, the Pickering balance favors the government as a matter of law." *Rose,* 291

adversely affect the public employer's ability to effectively run its operations and accomplish its objectives. At the same time, the speech may impair the public employer's ability to implement policies through loyal subordinates. *Hall*, 856 F.2d at 263.

In these situations, it may be difficult to distinguish where the efficient functioning of the government workplace ends and the employee's loyalty and ability to implement the public employer's policies begins. *See McEvoy v. Spencer*, 124 F.3d 92, 99 (2d Cir. 1997). In this sense, *Elrod* considerations of fidelity may easily converge with the government's interest in managing an efficient workplace under the *Pickering* spectrum. *See, e.g., Kinsey v. Salado Indep. Sch. Dist.,* 950 F.2d 988, 994 (5th Cir. 1992) (en banc) ("[C]ases involving public employees who occupy policymaker or confidential positions fall much closer to the employer's end of the spectrum, where the government's interests more easily outweigh the employee's (as a private citizen)."); *Hall,* 856 F.2d at 263 ("Given the similarity in the bases and countervailing interests recognized in *Pickering* and *Elrod-Branti,* the government interest recognized in the affiliation cases is also relevant in the employee speech cases."). The government's interest in appointing

_____

F.3d at 921. Whether or not this can be decided as a matter of law, the government's interest in these kinds of cases is likely dispositive.

politically loyal employees to policymaking positions converges with its interest in running an efficient workplace.

### D.

To establish a First Amendment violation under *Pickering*, Curinga must demonstrate that his speech involved a matter of public concern, and that his interest in the speech outweighs any potential disruption of the work environment and decreased efficiency of the office. Curinga openly campaigned against the "Regular Team" Democrats by writing the Sons of Columbus letter and urging members of the organization to vote for his ticket and against his opponents. His speech and conduct involved a matter of public concern.[6] *See Green,* 105 F.3d at 885-86 ("A public employee's speech involves a matter of public concern if it can be 'fairly considered as relating to any matter of political, social or other concern to the community'") (citations omitted). *See also Bass v. Richards,* 308 F.3d 1081, 1088-89 (10th Cir. 2002) (holding that speech regarding political elections involves a matter of public concern); *Brady v. Fort Bend County,* 145 F.3d 691, 706-07 (5th Cir. 1998) (stating that campaigning for a

_____

[6]The District Court found that Curinga's letter addressed only a matter of personal concern. We disagree. The letter contained a mixture of personal and public matters. For our purposes, however, there was sufficient content of public concern to warrant consideration under *Pickering*.

political candidate relates to a matter of public concern); *Gardetto v. Mason,* 100 F.3d 803, 812 (10th Cir. 1996) ("In the spectrum of expression protected by the First Amendment, we place great value upon political speech in the electoral process.").

But Curinga cannot establish that his interest in speech outweighed the government's interest in efficiency. *See Baldassare,* 250 F.3d at 195; *Swineford v. Snyder County,* 15 F.3d 1258, 1280 (3d Cir. 1994). Curinga's campaign against the candidates who won the election impaired the reconstituted city council's interest in efficient operations. The record strongly supports this conclusion. As noted, Curinga occupied the most sensitive, high-level policy making appointive position in the City of Clairton, one that required confidentiality and a close working relationship with city council members to effectively implement their policies. Under this set of facts, the strong government interest outweighs the employee's speech. *Pickering,* 391 U.S. at 581.[7]

---

[7]As noted, defendants provided several reasons for terminating Curinga, including Curinga's prior DUI conviction; his job performance and track record as City Manager; his excessive absences during the campaign; the Sons of Columbus letter; his suit alleging election fraud; and the desire of the city council to retain a City Manager "more acceptable and compatible with their policies, beliefs, desires, and aims for the future of the City

Nor can Curinga prevail under *Elrod-Branti.* The District Court held that political "affiliation" was a reasonable requirement for Curinga's position. We agree. The duties of the city manager required the management of all city departments, hiring and firing city employees, representing the city at meetings, and implementing policies promulgated by the city council. No non-elective position in the City of Clairton carried greater policy making responsibility. Because of Curinga's conduct, the "regular" Democratic council members had good reason to doubt whether they could rely on him to follow and implement their policies, or whether he would instead "obstruct[] the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod,* 427 U.S. at 367. For these reasons, Curinga's policy making responsibilities exempt him from *Elrod/Branti* protections generally afforded to patronage dismissals.

Curinga, therefore, cannot prevail under either constitutional doctrine. Although in this case the outcome will be the same, we believe the dispositive analysis should fall under the *Pickering* balancing standard.[8]

---

of Clairton." The District Court believed the Sons of Columbus letter provided the principal motivation behind the termination.

[8]As noted, the other courts of appeals have taken somewhat different approaches

to similar fact situations. The Fifth, Tenth and Eleventh Circuits have applied the *Pickering* test when a policymaker speaks against his employer during an election campaign. *See Kinsey*, 950 F.2d at 994-96 (5th Cir. 1992) (upholding the termination under *Pickering* of a school district superintendent for vocally opposing school board members); *Kent v. Martin*, 252 F.3d 1141, 1142-43 (10th Cir. 2001) (applying *Pickering* to analyze the termination of a deputy clerk who unsuccessfully ran against the county clerk); *Stough v. Gallagher*, 967 F.2d 1523, 1528-29 (11th Cir. 1992) (finding deputy sheriff's demotion for supporting political opponent of sheriff violated deputy sheriff's First Amendment rights under *Pickering*).

The First, Second, Sixth, and Seventh Circuits have upheld terminations or other disciplinary measures taken by the government under the *Elrod/Branti* exception when an employee speaks out against his employer during an election campaign. *See Rosenberg v. City of Everett,* 328 F.3d 12, 17-18 (1st Cir. 2003) (upholding termination of television station director by current mayor under *Elrod* because the director allowed the former mayor to submit his candidacy videotape after the station's established deadline, creating a perceived lack of political support for the current mayor); *Regan v. Boogertman,* 984 F.2d 577, 581-82 (2d Cir. 1993) (holding that the dismissal of a public employee for "partisan political reasons" was allowable under *Elrod* when the employee actively

## III.

To summarize, the Clairton City Council did not unlawfully terminate Curinga for stumping for the "Action Team" Democrats and against the "regular" Democratic candidates. Although the result is likely to be the

opposed her employer's party and endorsed candidates from an opposing party); *Kaluczky*, 57 F.3d at 204-05 (2d Cir. 1995) (upholding demotion of personnel officer under *Elrod* for actively endorsing mayor who was not re-elected); *Williams,* 909 F.2d at 153-54 (6th Cir. 1990) (upholding termination of city attorney under *Elrod* for distributing campaign literature that criticized a subsequently elected member of city council); *Heideman v. Wirsing*, 7 F.3d 659, 662 (7th Cir. 1993) (upholding suspension and termination under *Elrod* of a deputy sheriff who actively campaigned against the subsequently elected sheriff); *Wilbur,* 3 F.3d 214, 217-18 (7th Cir. 1993) (upholding under *Elrod* unpaid leave for deputy sheriff who announced his candidacy for office against the current sheriff). The Ninth Circuit allows for disciplinary action against policymakers for any type of speech under *Elrod*, including speech not related to policy views or a political agenda. *Fazio v. City & County of San Francisco,* 125 F.3d 1328, 1332 (9th Cir. 1997) (upholding termination under *Elrod* of assistant district attorney who filed papers to run against district attorney in upcoming election).

same under *Elrod* and *Pickering*, when an employee's speech is intermixed with political affiliation, the *Pickering* balancing standard is the better analysis to apply. Because the City of Clairton's interest in efficient management strongly outweighs Curinga's interests, his political speech in this case is not protected under *Pickering*.

## IV.

For the reasons stated, we will affirm the grant of summary judgment for defendants.