

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-14-2005

# Grigsby v. Kane

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1707

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Grigsby v. Kane" (2005). *2005 Decisions.* Paper 114.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/114

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1707

———

KAREN GRIGSBY;
JEFFREY T. BROWN

v.

YVETTE KANE; ROBERT J. DESOUSA; ROGER CAFFIER; GERALD M.
MACKAREVICH; RUTH D. DUNNEWOLD; THE PA ASSOCIATION OF
REALTORS; PAUL A. TUFANO; C. MICHAEL WEAVER, each individually, and in
their official capacities; CAROLYN E. JOHNSON, in her personal and official capacity;
LEGAL AID OF CHESTER COUNTY, INC., a nonprofit corporation; ROBERT F.
ADAMS, in his personal and official capacity; GAWTHROP, GREENWOOD &
HALSTED, a personal corporation; KALOGREDIS, TSOULES AND SWEENEY LTD.;
DAVID R. DEARDON, in his personal capacity;
CHARLES W. RUBENDALL, II

Karen Grigsby,

*Appellant*

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 99-cv-2083)
District Judge: Honorable Gregory M. Sleet

———

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 6, 2005

Before: RENDELL, FISHER, and VAN ANTWERPEN, <u>Circuit Judges</u>.

(Filed: December 14, 2005)

OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

Plaintiff Karen R. Grigsby appeals from the District Court's grant of summary judgment in favor of all Defendants in this First Amendment retaliation and racial discrimination employment suit brought by Grigsby pursuant to 42 U.S.C. §§ 1981 and 1983.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

I.

We construe the facts and inferences therefrom in the light most favorable to non-movant Grigsby. On December 2, 1999, Grigsby filed a *pro se* complaint alleging retaliation in violation of 42 U.S.C. § 1983. She amended her complaint on March 30, 2000 to also allege racial discrimination in violation of 42 U.S.C. § 1981, and amended the complaint again on June 18, 2001. She timely appealed from the February 2, 2005 order of the District Court granting Defendants' motion for summary judgment and dismissing with prejudice all of Grigsby's claims.

The Pennsylvania Office of General Counsel, Bureau of Professional Occupational Affairs, hired Grigsby as an attorney in 1987. She was promoted twice in the next six years, achieving the highest possible non-supervisory status, "Attorney III." Relevant to her § 1983

---

[1] Grigsby appeals the District Court's grant of summary judgment and dismissal of her complaint only as against defendants Kane, Tufano, DeSousa, Mackarevich, Caffier, and Weaver.

retaliation claim, Grigsby was assigned a licensing case in 1996 involving a dentist with a communicable disease. Grigsby consulted a medical expert who opined that, despite treatment, the dentist was apt to revert to infectious status. Her supervisor at the time, Caffier, responded by ordering Grigsby to instead rely on a second specialist and the opinion of the dentist's own doctor. Grigsby alleges this was a "political fix" because the dentist was a large financial contributor to the then-Governor's administration. During the case, Grigsby objected in writing to Caffier several times and refused to sign off on the dentist's final license; as a result, she alleges, Caffier assigned her too few cases, causing her to appear deficient under the Bureau's "quota" system for evaluating attorney performance. Caffier did this, she claims, even though DeSousa ordered that she be assigned more cases, so that she could have an opportunity to prove herself under the quota system.

Relevant to her § 1981 racial discrimination claim, Grigsby's supervisors were Weaver and Mackarevich from 1991 through 1994 and 1994 through November 1995, respectively. Caffier then became her superior (along with DeSousa, Tufano, and Kane, indirectly, through the administrative hierarchy) until her termination in June, 1998. Caffier and DeSousa each had a role in the "quota" evaluation system that Grigsby contends was pretextually manipulated; each had at least potential knowledge that three Causasian attorneys in the Bureau received transfers out from under Caffier's supervision and that their reviews improved thereafter; and each had at least potential knowledge that a fourth Caucasian attorney was allowed a year to improve after receiving the same written disciplinary notice that Grigsby received on June 2, 1998, or nine days before she was

3

terminated. Next, in addition to Caffier's conduct in the dentist licensing case, described above, the record shows DeSousa did not promote African-American attorneys in the Bureau during his tenure as Chief Counsel for Pennsylvania's Department of State, and once commented that Grigsby was sitting "in the back of the bus" when he observed her sitting with other African-Americans near the back of the room at a meeting. As to Tufano, the General Counsel for the Commonwealth at the time, the record shows that he approved Grigsby's termination and replaced her with a Caucasian attorney. Finally, as to Grigsby's direct supervisors prior to Caffier, the record shows that Mackarevich maintained a professional distance from Grigsby and allegedly avoided assigning her complex cases, that Weaver similarly did not assign her complex cases, and that Weaver made comments to others about not wanting African Americans to work in Pennsylvania's state government.[2]

The record also shows that Grigsby received either "needs improvement" or subpar performance reviews starting in mid-1995; specifically, of some eleven annual and interim reviews issued between mid-1995 and her termination on June 11, 1998, some seven articulated concerns about Grigsby's work product (both substantive legal errors and proofreading problems), productivity, and ability to work independently.

## II.

We review *de novo* the District Court's decision to grant summary judgment, *Blair*

---

[2] Here, the record evidence was provided by the deposition testimony of co-plaintiff Jeffrey T. Brown. Mr. Brown filed suit in conjunction with Ms. Grigsby, alleging similar claims against some of the Defendants. His claims were dismissed with prejudice by the District Court by order dated February 9, 2005, and he did not appeal from that order.

*v. Scott Specialty Gases*, 283 F.3d 595, 602-03 (3d Cir. 2001), applying the same standard as the District Court to determine whether there were genuine issues for trial and whether, viewing the facts in the light most favorable to Grigsby, Defendants were entitled to judgment as a matter of law. *See Morton Intern., Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 680 (3d Cir. 2003); *Curinga v. City of Clairton*, 357 F.3d 305, 307 n.1 (3d Cir. 2004). We make an independent constitutional judgment to determine whether the speech involved was constitutionally protected. *Connick v. Myers*, 461 U.S. 138, 150 n.10 (1983); *Watters v. City of Philadelphia*, 55 F.3d 886, 891 (3d Cir. 1995).

III.

We first address Grigsby's § 1983 retaliation claim, tracing *Curinga*'s recent discussion of the applicable law. "Public employees have a First Amendment right to speak freely on matters of public concern." *Curinga*, 357 F.3d at 309 (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 571-72 (1968)). "But there is protection only for speech in matters of public concern" that "is not likely to disrupt the efficient operation of the workplace." *Id.* (citing *Pickering* at 568; *Connick*, 461 U.S. at 146). Under a *Pickering* analysis, there are three factors to consider in a public employee's retaliation claim for engaging in protected activity.[3] First, as discussed, "the employee must demonstrate that the speech involves a

---

   [3] As we observed in *Curinga*, "a separate analysis for politically motivated discharges of public employees" exists pursuant to the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980). *Curinga*, 357 F.3d at 310. Under this separate analysis, while the Court has "restricted the dismissal of public employees for partisan reasons to protect the employees' freedom of political belief and association . . . [and] restricted the use of patronage to insure the efficiency of

matter of public concern and the employee's interest in the speech outweighs the government's employer's countervailing interest in providing efficient and effective services to the public. Next, the speech must have been a substantial or motivating factor in the alleged retaliatory action. Finally, the employer can show that it would have taken the adverse action even if the employee had not engaged in the protected conduct. The second and third factors are questions of fact, while the first factor is a question of law." *Curinga*, 357 F.3d at 309.

"A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Curinga*, 357 F.3d at 312-13 (internal quotation and citations omitted). Yet here, even assuming that Grigsby so spoke (the record shows only that Grigsby wrote internal memoranda to Caffier and refused to sign off on internal Bureau paperwork authorizing the the dentist's ultimate license), the District Court did not err in concluding that Grigsby cannot prevail in light of the second prong of *Pickering*'s threshold inquiry, which asks, as stated, whether Grigsby's speech interest outweighs the countervailing interest of her supervisors and the Bureau in providing "efficient and effective services to the public." *Curinga*, 357 F.3d at 309. Specifically, the *Pickering* balancing test requires determination of "'whether

---

the public workplace, . . . . [it has] allowed dismissals based on political affiliation for 'policymaking' positions." *Id.* Here, the District Court correctly concluded that, although both the *Pickering* and *Elrod* lines of jurisprudence must be considered in certain First Amendment retaliation cases, the *Pickering* balancing test controls here, where political affiliation is not at issue and the speech is alleged to have impaired a close supervisory or working relationship. *See Curinga*, 357 F.3d at 310.

the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* at 310 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).  As such, consistent with the Supreme Court's requirement that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," *Connick*, 461 U.S. at 151-52, we have previously held that "the crucial variant in the balance appears to [be] the hierarchical proximity of the criticizing employee to the person or body criticized." *Sprague v. Fitzpatrick*, 546 F.2d 560, 564 (3d Cir. 1976).

In speaking here, Grigsby plainly acted not as a private citizen, but rather in her capacity as a senior Bureau attorney assigned to, and in charge of, a complex and difficult licensing case.  The record also undisputably shows that her speech directly challenged her immediate supervisor, Caffier, about that case.  Even construed in the light most favorable to Grigsby, the record further presents a clear and profound disruption in the working relationship between Grigsby and Caffier that impeded the Bureau's efficiency and effectiveness.  *See, e.g., Sprague*, 456 F.2d at 564-65.  As such, Grigsby's speech interest was outweighed as a matter of law by her employer's interest in an effective and efficient workplace.  *See id.*; *see also Curinga*, 357 F.3d at 313.[4]  Accordingly, we will affirm the

---

[4] Our conclusion is reinforced by the undisputed record evidence that, as an employee with "Attorney III" status, Grigsby's role in the Bureau was not ministerial.  The

decision of the District Court on this prong of the *Pickering* inquiry.

IV.

Next, we analyze Grigsby's related § 42 U.S.C. § 1981 claim of employment discrimination on the basis of race. As the District Court correctly determined, the applicable legal framework was set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this test, Grigsby had the burden of making a prima facie case of discrimination by showing (1) that she is a member of a protected class, (2) that she was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably. Here, Defendants concede that Grigsby makes out a prima facie case, but challenge the continuing violation theory she advances to reach conduct time-barred by the applicable statute of limitations. Absent application of such a theory, the record evidence with respect to Weaver and Mackarevich, including the corroborating testimony of Mr. Brown, would be precluded. For the reasons we discuss *infra*, Grigsby's § 1981 claim lacks substantive merit even if all of her evidence is considered. Consequently, we will assume, without deciding, that a continuing violation theory applies in this case.

We turn to the substantive analysis set forth in *McDonnell Douglas* and its progeny.

---

*Pickering* test "takes into account the extent of authority entailed in the employee's position," *Curinga,* 357 F.3d at 310 (citing *Rankin*, 483 U.S. at 390), and thus it appears vital that Grigsby, having the highest-ranking non-supervisory status in the Bureau, maintain "a close working relationship" with her supervisor, Caffier, as well as DeSousa and Tufano, "to effectively implement their policies." *Curinga*, 357 F.3d at 313 (citing *Pickering*, 391 U.S. at 581). Under these facts, the Bureau's interest is strong and outweighs Grigsby's speech interest. *Id.*

There, as discussed, the Supreme Court established that, should a plaintiff successfully make out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 802. "[S]hould the defendant carry this burden, the plaintiff then must have an opportunity to prove . . . the legitimate reasons offered by the defendant . . . were a pretext for discrimination." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).[5] With Grigsby having made out a prima facie case, the presumption arises that Defendants discriminated against her, placing the burden on Defendants to present a nondiscriminatory reason for their decision to terminate Grigsby. *McDonnell Douglas*, 411 U.S. at 802. At this second step, "the defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions, which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations and quotations omitted) (emphasis in original). Here, as summarized above, the summary judgment record contains ample evidence that, if believed by a fact finder, would reasonably support a finding that Grigsby was terminated for subpar work performance in the mid-1995 to mid-1998 time period.

---

5 Grigsby correctly observes that, under *Weldon v. Kraft, Inc.*, 896 F.2d 793 (3d Cir. 1990), "[a] plaintiff need not *carry* th[e] *McDonnell Douglas* burden . . . to withstand a motion for summary judgment." *Id.* at 797 (emphasis added). However, in so stating, she appears to conflate her burden for *prevailing* on the claim with her burden at summary judgment, which is to demonstrate a "genuine issue as to any material fact" relevant to the *McDonnell Douglas* analysis. *See id.*

Defendants having presented a legitimate, nondiscriminatory reason for terminating Grigsby, the *McDonnell Douglas* burden shifts back to her to present pretext evidence that either (1) casts doubt upon each of the reasons offered by Defendants so that a fact-finder could reasonably conclude that each was a fabrication; or (2) allows the fact-finder to infer that discrimination was more likely than not the cause for the employment action. *See Fuentes v. Perskie*, 32 F.3d 759, 761 (3d Cir.1994). Here, Grigsby has not made either showing. First, her attempt to cast doubt upon the Defendants' multiple reasons for terminating her is limited only to an assertion that "she was actually directed by them" to do things on cases "that would demonstrate incompetency" — such as, she argues, being ordered to issue a license to a dentist with a communicable disease. Br. at 35. However, neither this argument nor Grigsby's evidence at summary judgment actually casts doubt upon the specific reasons for termination as articulated by her superiors. The record shows Grigsby's supervisors were specifically concerned about her poor written work product (both in terms of substantive legal errors and proofreading problems), low productivity, and an inability to work independently. While the record construed in the light most favorable to Grigsby allows the conclusion that she has cast doubt on her low productivity (because Caffier, Mackarevich, and Weaver did not assign her enough cases and/or only menial cases, causing her to appear deficient under the quota system), nothing in the record casts doubt on the articulated concerns of poor written work product and an inability to work independently, which are reflected in the record through multiple specific performance evaluations. Second, even "[i]f a factfinder were to credit [Grigsby's] testimony" and the corroborating testimony

of Brown, it could not, on this record, infer that discrimination was more likely than not the cause for the employment action. *See, e.g., Weldon*, 896 F.2d at 799; *see also Fuentes,* 32 F.3d at 761. This conclusion is supported not only by our analysis thus far, but also by our observation of the following additional points. Despite working from 1991 to 1994 for the allegedly discriminatory Weaver, Grigsby received a promotion under that supervisor in 1993, elevating her to the highest non-supervisory status possible in the Bureau. And despite being allegedly assigned to only "routine" cases since 1991, purportedly to thwart her professional growth, she was promoted twice in six years and was assigned to an unusually challenging case, the dentist licensing case, in 1996. Just as the record in this case precludes a trier of fact from finding pretext, it precludes a trier of fact from concluding discrimination was more likely than not the cause for Grigsby's termination in 1998. Accordingly, summary judgment for Defendants on Grigsby's § 1981 claim was also appropriate.

For the foregoing reasons, the order of the District Court dated February 2, 2005 is affirmed.