**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2411
_____

THOMAS D. KIMMETT,
                          Appellant

v.

TOM CORBETT; BRIAN NUTT;
WILLIAM RYAN; STEVE BRANDWENE;
MIKE ROMAN; JILL KEISER;
PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL;
JOHN DOES 1-10; LOU ROVELLI
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 4-08-cv-01496)
District Judge: Hon. Matthew W. Brann
_____

Submitted Under Third Circuit LAR 34.1(a)
January 7, 2014
_____

Before: SMITH, SHWARTZ, and SCIRICA, <u>Circuit Judges</u>.

(Filed: January 28, 2014)
_____

OPINION
_____

SHWARTZ, <u>Circuit Judge</u>.

Thomas Kimmett claims that Thomas Corbett, Brian Nutt, William Ryan, Stephen Brandwene, Michael Roman, Jill Keiser, and Louis Rovelli (collectively, the "Defendants") violated his First Amendment rights by failing to promote him and ultimately terminating his employment at Pennsylvania's Office of Attorney General ("OAG") in retaliation for his reporting alleged wrongdoing and mismanagement in the OAG and the Pennsylvania Department of Revenue ("DOR"). The District Court granted summary judgment in favor of Defendants. We will affirm.

## I. Background

### A. The Financial Enforcement Section

The Financial Enforcement Section ("FES") is a section in OAG's Civil Law Division. The FES collects debts owed to various Commonwealth entities. It is comprised of the Law unit and the Administrative Collections unit ("ACU"). The Law unit handles bankruptcy cases and certain collection matters. The ACU collects debts owed to state entities, including the DOR. If the FES collection efforts fail, these uncollected debts are referred to private collection agencies ("PCAs"). The ACU manages PCA contracts, receives payments from the PCAs, and pays PCAs commissions on debts they collect. Occasionally, debtors whose accounts are referred to PCAs pay the "client" agency directly. In these so-called "pay direct" cases, the ACU pays the PCA its commission and then bills the appropriate client agency.

2

B.      Kimmett's Tenure at FES

Before Kimmett was hired as the ACU Supervisor, problems were uncovered. For example, the software system used to manage accounts was found to be inadequate, requiring employees to use manual processes for many collection tasks. In addition, PCA contracts contained inconsistent language and contractual terms concerning the PCAs' obligations to pay interest on amounts held for the Commonwealth and terms requiring audits of PCAs' financial statements were not enforced.

In light of these problems, Executive Deputy Attorney General Rovelli, the Director of the Civil Law Division,[1] hired Kimmett, who had both a legal and accounting background, as a Senior Deputy Attorney General to manage the ACU. Kimmett was expected to "manage administrative collections," address "the breakdown in the fund flow," and "modernize the operation." App. 65. According to Kimmett, his "marching orders" were to "review all aspects of [the FES] and identify any problems, issues, improprieties, etc. that exi[s]t in the operation." App. 566. To reach this goal, Kimmett sought to complete a "cradle-to-grave review of the FES collection operation" and hoped to "[d]evelop better working relationships with state-agencies." App. 465. Day-to-day, Kimmett was responsible for managing PCA contracts, developing procedures for the review and approval of commission payments, including "pay directs," reviewing and approving certain settlements with debtors ("compromises"), working with other state

[1] Rovelli reported to Ryan, who, as the First Deputy Attorney General, was directly below Attorney General Corbett in the OAG chain of command. Ryan oversaw all legal and administrative matters on the law side of the OAG. Corbett's Chief of Staff, Nutt, also reported directly to Corbett. Nutt was not directly responsible for any part of the Civil Law Division, including the FES.

3

agencies, especially the DOR, and addressing legal issues relating to his unit's work. Kimmett supervised a staff of eight to twelve people, including Jill Keiser,[2] and reported to Brandwene, the FES Chief.

Kimmett claims he discovered evidence of mismanagement, improprieties, and malfeasance in both the FES and the DOR. As to the FES, Kimmett claimed that: (1) FES employees destroyed accounting documents; (2) certain FES and DOR employees treated PCAs too favorably by allowing them to collect commissions on accounts for which they did no work and withhold interest on amounts they collected; and (3) the FES collection process was slow and inefficient. As to the DOR, Kimmett claimed that it: (1) refused to collect certain fees from debtors as required by law; (2) authorized an unearned payment of approximately $300,000 to a PCA; (3) approved unjustified debt compromises; and (4) approved certain compromises that allowed debtors to circumvent the DOR appeals process.

Kimmett claims that he raised these concerns within and outside of his chain of command,[3] as well as to an Assistant United States Attorney, an FBI agent, a former colleague who worked at the Pennsylvania Commission on Crime and Delinquency, and the Executive Director of the Team Pennsylvania Foundation ("non-OAG/DOR individuals"). There is no evidence that Defendants knew of Kimmett's conversations with these non-OAG/DOR individuals.

---

[2] Keiser was the ACU Supervisor before Kimmett. After Kimmett's hiring, she was below Kimmett in the chain of command. The record does not disclose retaliatory acts she purportedly took against him.

[3] Nutt was outside of Kimmett's chain of command.

4

Kimmett claims Defendants ignored these issues, and, in retaliation for his complaints, declined to promote him to FES Chief when Brandwene retired. Instead, the OAG hired Michael Roman as FES Chief.

Roman and Rovelli grew increasingly dissatisfied with Kimmett's performance. They claimed that they received complaints that Kimmett frequently and needlessly rejected compromises, harshly treated his staff, and consistently failed to follow protocol when communicating with DOR employees. In June 2008, Roman and Rovelli removed Kimmett from a large software project that he had spearheaded. Rovelli and Roman also voiced their concerns about Kimmett to Ryan and the three of them decided to transfer Kimmett to the Law unit.

In August 2008, Kimmett filed a federal Complaint, asserting that Corbett, Nutt, Ryan, Ravelli, Brandwene, and Roman and certain high-level employees at the DOR failed to promote him in retaliation for his complaints of wrongdoing in the collection process and that they failed to investigate this "illegal misconduct" for "purely political purposes." App. 220-21. Kimmett also alleged that DOR employees "participated in the unlawful actions of the other defendants, including Corbett, in unlawfully covering up the illegal activities" and engaged in the "conspiratorial destruction of [Kimmett's] promotional opportunities." App. 230.

According to Rovelli, the lawsuit damaged Kimmett's working relationships with his supervisors and the DOR, and his allegations of criminal behavior by Corbett and DOR employees led Rovelli to conclude that Kimmett could not litigate in the name of

5

the Attorney General or on behalf of the DOR. As a result, the plan to transition Kimmett to the Law unit was abandoned.

In November 2008, Kimmett received his second annual performance evaluation.[4] The evaluation criticized his allegedly unwarranted disapprovals of compromises, failure to complete the software project, and negative attitude. The evaluation also included a remedial plan that required Kimmett to work closely with Roman on all proposed compromises to ensure that Kimmett was acting reasonably.

In his response to the evaluation, Kimmett stated that: (1) he believed that "the entire evaluation [was] inappropriate because it is part of an orchestrated and deliberate effort" by OAG staff to "discredit" him since his lawsuit, App. 331; (2) he found it "surreal" that individuals he sued were the same individuals reviewing him, App. 331; (3) Roman "was placed in [the position of Chief of the FES] to stifle and curtail any further investigations . . . and to fabricate and trump up charges against [him]," App. 333; and (4) while he welcomed an inquiry into compromise practices, such an examination could not "be performed by Roman or anyone in the Civil Law Division in a fair and unbiased way and not become a backdoor attempt to fabricate charges against [him]." App. 334.

Rovelli viewed Kimmett's response as "unmeasured and intemperate" and showed an unwillingness to accept supervision and a refusal to cooperate with the remedial plan. App. 910-12. Rovelli recommended that Corbett terminate Kimmett. After a meeting

---

[4] The evaluation was written three days before Kimmett filed his Complaint, but its delivery was delayed until November 2008 by agreement of Kimmett's trial counsel and the OAG.

with Rovelli, Ryan, and Nutt, Corbett approved Rovelli's recommendation and terminated Kimmett.

After his termination, Kimmett filed an Amended Complaint alleging, among other things, that the Defendants retaliated against him in violation of the First Amendment by failing to promote him and by terminating his employment.[5] After discovery, the parties filed cross-motions for summary judgment. The District Court granted Defendants' motion and held that, while portions of Kimmett's speech were made as a citizen and addressed matters of public concern, Defendants were nevertheless entitled to summary judgment because the OAG's interest in workplace harmony outweighed Kimmett's and the public's interest in Kimmett's speech.[6] Kimmett appeals the District Court's order granting Defendants' motion.[7]

---

[5] Kimmett's free speech claim was brought under the First Amendment's Speech Clause and his allegation of retaliation for filing his lawsuit is based on its Petition Clause. The standards applicable to each type of protected conduct are similar. Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct 2488, 2494-95 (2011).

[6] The District Court declined to exercise supplemental jurisdiction over Kimmett's Pennsylvania Whistleblower Law and defamation claims. See 28 U.S.C. § 1367(c)(3).

[7] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's order granting summary judgment. Jacobs Constructors, Inc. v. NPS Energy Servs., Inc., 264 F.3d 365, 369 (3d Cir. 2001). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the Court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

7

## II. Discussion

To prevail on a First Amendment retaliation claim, a public employee must demonstrate that: (1) he or she engaged in activity that is protected by the First Amendment, and (2) the protected activity was a substantial factor in the employer's retaliatory action. Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009). "The first factor is a question of law; the second factor is a question of fact."[8] Id. (quotation marks and citation omitted). "If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred." Id.

The Court proceeds through three steps to ascertain whether a public employee's speech is protected by the First Amendment. First, the Court must determine whether the employee's speech was made pursuant to his or her official duties, which would not be protected by the First Amendment, or whether it was made as a citizen, which would be protected by the First Amendment.[9] Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). Second, if the speech was not made pursuant to an employee's official duties, the Court

---

[8] Summary judgment is appropriate if a plaintiff fails to adduce sufficient evidence on one of the factors typically reserved for the jury. See Hill v. City of Scranton, 411 F.3d 118, 127 (3d Cir. 2005). Here, Kimmett has adduced no evidence establishing that Defendants were aware of the communications he made to the non-OAG/DOR individuals. Thus, these communications could not have been a substantial or motivating factor in the alleged retaliatory actions. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002). For this reason, summary judgment in favor of Defendants as to these communications is appropriate.

[9] If an employee's speech was made pursuant to his official duties, "we need not examine whether [his] speech passes the [second and third steps, which were] established by [Pickering v. Board of Education, 391 U.S. 563 (1968),] and its progeny." Foraker v. Chaffinch, 501 F.3d 231, 243 (3d Cir. 2007), abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488 (2011).

8

considers whether "the employee spoke as a citizen on a matter of public concern." Id. at 418. Third, if the answer to that question is yes, the Court must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. When making this determination, the Court attempts to "'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Id. (quoting Pickering, 391 U.S. at 568).

A. Citizen Speech or Pursuant to Employment Duties

While the Supreme Court has not articulated a "comprehensive framework for defining the scope of an employee's duties," it has held that the "proper inquiry is a practical one." Id. at 424-25. When making this "practical" inquiry, the Court examines, among other things: (1) whether the employee's speech relates to "'special knowledge' or 'experience' acquired through his job," Gorum, 561 F.3d at 185 (citing Foraker, 501 F.3d at 240); (2) whether the employee raises complaints or concerns about issues relating to his job duties "up the chain of command" at his workplace, Foraker, 501 F.3d at 241; (3) whether the speech fell within the employee's designated responsibilities, Gorum, 561 F.3d at 186;[10] and (4) whether the employee's speech is in furtherance of his designated duties, even if the speech at issue is not part of them. See Foraker, 501 F.3d at 243.

---

[10] While a formal job description is not dispositive for determining whether the employee's acts were "within the scope of [his] professional duties for First Amendment purposes," Garcetti, 547 U.S. at 425, we examine it to determine if it accurately describes

In this case, Kimmett's conduct can be divided into three categories: (1) the filing of this lawsuit; (2) communications with others at the OAG; and (3) communications with DOR employees or about DOR issues. While the first category of speech—the current lawsuit—is outside of Kimmett's job duties, Kimmett's speech in the last two categories was a part of his job duties.

### 1. Communications within the OAG

Kimmett's speech within the OAG was made pursuant to his job duties as the ACU Supervisor. First, much of the speech that Kimmett points to was made directly to his immediate supervisor about the unit. Because this speech was made up the chain of command and related to his employment duties, it was pursuant to his job duties. See Foraker, 501 F.3d at 241. Second, his speech to Nutt and to individuals higher in the chain of command related to the treatment of PCAs, the FES collection process, the approval of compromises, and document destruction by FES employees before he was hired. As the ACU Supervisor, Kimmett was directly responsible for managing the PCA contracts, the FES collection process, the compromise process, and subordinates within ACU. Accordingly, this speech was pursuant to his job duties, and, thus, cannot provide a basis for relief under the First Amendment. See Garcetti, 547 U.S. at 421 ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not

the employee's duties, and, if so, we will consider the job description when determining whether the employee spoke pursuant to those duties. See Gorum, 561 F.3d at 186.

insulate their communications from employer discipline."). Thus, summary judgment in favor of the Defendants on this speech was appropriate.

### 2. Speech to DOR Employees or about DOR Issues

Kimmett's job required him to work closely with the DOR and other agencies that referred debts to the ACU. The ACU was required to review proposed compromises from other agencies and to pay commissions to PCAs after a "direct pay" from a debtor to the agency. Because Kimmett worked closely with other agencies, he frequently gained information about their internal operations, much of which was relevant to his duties as the ACU Supervisor.

Most of the speech that Kimmett points to relates to the payment of an unauthorized PCA commission and problems with certain debt compromises. These areas fall within Kimmett's express duties as the ACU Supervisor. Moreover, to the extent that his complaints about the DOR concerned subjects that fell outside of his express duties, Kimmett learned about them through his close working relationship with the DOR. Further, because the ACU worked so closely with the DOR, any impropriety or mismanagement at the DOR would necessarily affect the efficient operation of the ACU. Thus, Kimmett's communications regarding the problems at the DOR relate to his "special knowledge" of the DOR's operations that he obtained by virtue of his position at the FES, see Gorum, 561 F.3d at 185-86, and were in furtherance of his managerial duties in the ACU. See Foraker, 501 F.3d at 243. For these reasons, his speech to DOR employees or concerning DOR issues was within his job duties and, under Garcetti and Foraker, the allegedly retaliatory responses could not give rise to a First Amendment

11

claim, and thus, summary judgment on this speech in favor of the Defendants was appropriate.

B.       Matter of Public Concern

Since Kimmett's lawsuit is the only activity that could potentially be protected, we must next determine whether the lawsuit relates to a matter of public concern.  An employee's speech "implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community."  Miller v. Clinton Cnty., 544 F.3d 542, 548 (3d Cir. 2008); see also Connick v. Myers, 461 U.S. 138, 148 (1983) (noting that speech that "bring[s] to light actual or potential wrongdoing or breach of public trust" is a matter of public concern); Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983) (holding that allegations of "inefficient, wasteful, and possibly fraudulent" government practices are matters of public concern).  As Defendants concede, Defendants Br. 32, Kimmett's lawsuit concerned allegations of actual or potential wrongdoing on the part of the OAG and hence it relates to matters of public concern.

C.       Pickering Balancing

This Court must next determine whether Kimmett's "interest in the speech outweighs any potential disruption of the work environment and decreased efficiency in the office."  Curinga v. City of Clairton, 357 F.3d 305, 312 (3d Cir. 2004).[11]  If it does not, then Kimmett's speech is not protected by the First Amendment.  Id. at 314.

---

[11] Defendants argue that this Court should apply the holdings of two First Amendment freedom of association cases, Elrod v. Burns, 427 U.S. 347 (1976), and

12

When evaluating the disruption, we consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise," Rankin v. McPherson, 483 U.S. 378, 388 (1987), as well as "the hierarchical proximity of the criticizing employee to the person or body criticized." Baldassare v. State of N.J., 250 F.3d 188, 199 (3d Cir. 2001) (quotation and citation omitted).

Courts must also bear in mind that an employee who "accurately exposes rampant corruption" will no doubt cause a workplace disruption. O'Donnell v. Yanchulis, 875 F.2d 1059, 1062 (3d Cir. 1989) (citation and quotation marks omitted). In such a case, given the public's strong interest in legitimate whistleblowing, it would be "absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office . . . ." O'Donnell, 875 F.2d at 1062 (3d Cir. 1989) (citation and quotation marks omitted). Thus, the mere existence of a workplace disruption may not be sufficient to overcome the employee's interest. Czurlanis, 721 F.2d at 107. Instead, a public

Branti v. Finkel, 445 U.S. 507 (1980), wherein the Supreme Court explained that a public employer may dismiss an employee in a policymaking position based on political affiliation. See Curinga, 357 F.3d at 310. Because this is not a freedom of association case, we do not explicitly consider Elrod and Branti, but when conducting the Pickering balance, we do consider the responsibility and authority attendant to Kimmett's position as the ACU Supervisor, and whether it "required confidentiality and a close working relationship" with policymakers. Id. at 313.

13

employer must tolerate a workplace disruption so long as it is "directly proportional to the importance of the disputed speech to the public." Miller, 544 F.3d at 549 n.2.

Kimmett's lawsuit publicly accused his entire chain of command and staff at the DOR with whom he worked with "unlawfully covering up . . . illegal activities" for "purely political purposes." App. 221, 230. These allegations of politically motivated illegal behavior would certainly "impair[] discipline" and "harmony among co-workers," Rankin, 483 U.S. at 388, at the OAG, particularly with Kimmett's immediate supervisors, Rovelli and Roman, see Baldassare, 250 F.3d at 200; Roseman v. Ind. Univ. of Pa., at Ind., 520 F.2d 1364, 1368 (3d Cir. 1975) (affirming dismissal of First Amendment claim when speaker's expression "called into question the integrity of the person immediately in charge of running a department"), as well as the DOR. Indeed, his supervisors confirmed as much when Rovelli testified that Kimmett's lawsuit damaged his working relationships in the OAG and the DOR and when they cancelled plans to move Kimmett to the Law unit.

Moreover, Kimmett himself stated that even being reviewed by his supervisors was "inappropriate because it [was] part of an orchestrated and deliberate effort" by OAG staff to "discredit" him since his lawsuit. App. 331. In addition, even though he was required to work with Roman on compromises pursuant to his remedial plan, he claimed that, in light of the lawsuit, a review of the compromise process could not "be performed by Roman or anyone in the Civil Law Division in a fair and unbiased way and not become a backdoor attempt to fabricate charges against [him]." App. 334. Hence, according to Kimmett, because of his lawsuit, it was "inappropriate" for his supervisors

14

to review his work and he could not complete one of his assigned tasks in the remedial plan. For this reason, and as the District Court found, Kimmett's own statements demonstrate that his lawsuit "impair[ed] discipline by superiors," had "a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," and "impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." Rankin, 483 U.S. at 388. While the public has a "significant interest in legitimate whistleblowing," the extent of the disruption caused by Kimmett's allegations in his lawsuit tilts the Pickering balance in favor of Defendants. As a result, his First Amendment retaliation claim fails and summary judgment was appropriate.

### III. Conclusion

For these reasons, we will affirm.